## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| **JEANINE PATRICIA CHERRY,** ) | Civil Case No. 2:14-cv-02620-MGL-MGB |
| ) | |
| **Plaintiff,** ) | |
| v. ) | |
| ) | |
| ) | **REPORT AND RECOMMENDATION** |
| **CAROLYN W. COLVIN,** ) | |
| ) | |
| **Acting Commissioner of** ) | |
| **Social Security,** ) | |
| ) | |
| _____ ) | |

Plaintiff Jeanine Cherry, through counsel, brought this action to obtain judicial review of an unfavorable final administrative decision finding that she was no longer entitled to disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"). See Section 205(g) of the SSA, as amended, 42 U.S.C. § 405(g). This matter was referred to the Magistrate Judge for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and 28 U.S.C. § 636(b)(1)(B). Having carefully considered the parties' briefs, the administrative record, and applicable authority, the undersigned recommends that the Commissioner's final decision be **affirmed**, based on the following proposed findings of fact and conclusions of law:

**I.   Relevant Statutory Law**

Under the SSA, a "claimant for disability benefits bears the burden of proving a disability." *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). For purposes of the statute, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When disability benefits are granted, the regulations provide

that "your continued entitlement to such benefits must be reviewed periodically." 20 C.F.R. § 404.1594(a) ("We must determine if there has been any medical improvement in your impairment(s) and, if so, whether this medical improvement is related to your ability to work…in most cases … we must also show that you are currently able to engage in substantial gainful activity before we can find that you are no longer disabled").

As the Commissioner correctly indicated (AR 12-13), the Social Security regulations set forth an eight-step sequential process for determining medical improvement and whether to continue benefits. 20 C.F.R. § 404.1594(f)(1-8). The regulations explain that:

> "Medical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)."

Id. at § 404.1594(b), citing § 404.1528. "If there has been medical improvement to the degree that the requirement of the listing section is no longer met or equaled, then the medical improvement is related to your ability to work." Id. at § 404.1594(c)(3)(i). "In most instances, we must show that you are able to engage in substantial gainful activity before your benefits are stopped. When doing this, we will consider all your current impairments not just that impairment(s) present at the time of the most recent favorable determination." Id. at § 404.1594(b)(5). Impairments are considered separately and in combination. 42 U.S.C. § 423(d)(2)(B) (2012); Walker v. Bowen, 889 F.2d 47, 49-50 (4th Cir. 1989); see also, e.g., Saxon v. Astrue, 662 F.Supp.2d 471, 479 (D.S.C. 2009) (collecting cases emphasizing that a claimant's impairments must be considered both separately and in combination). An ALJ has a duty to consider all medically determinable impairments, not just those that are deemed "severe." 20 C.F.R. § 404.1523 (2013) ("[W]e will consider the combined effect of all of your impairments

without regard to whether any such impairment, if considered separately, would be of sufficient severity.").

## II. Factual Background and Procedural History

The relevant facts have been set forth in considerable detail in the Commissioner's final decision and are summarized here: Plaintiff was born February 25, 1982, has a high school education, is married with three children, is literate and communicates in English, has a driver's license, and has relevant work experience as a toll booth collection worker (classified as "light unskilled" work) for the New Jersey Turnpike (AR 36-38, 41, 57, 192).[1] She stopped working in April of 2007 while pregnant with her third child. (AR 42, 47). Plaintiff has a history of alcohol abuse and was referred to a chemical dependency program in 2009 (AR 201, 203, 233, "patient is strongly urged to decrease frequency of drinking").[2] She has reduced vision in her right eye.

Plaintiff, through counsel, filed an application for Title II disability benefits, alleging a disability onset date of April 11, 2007 due to her vision problem. On September 24, 2007, the Commissioner granted the application after determining that Plaintiff's "optic neuritis" met the requirements of an impairment listed in Appendix 1 (20 C.F.R. Part 404, Subpart P). Specifically, she met the requirements of Listing 2.03C, which applies when the contraction of the visual field in the claimant's better eye is limited to 20 percent or less visual field efficiency, as determined by kinetic perimetry. The Commissioner found that Plaintiff's eye condition met

---

[1] Plaintiff indicated that during 2000-2003, she also worked as a car inspector, receptionist, retail sales associate, security officer, and cashier. (AR 193-194).

[2] The Contract with America Advancement Act of 1996, Pub. L. No. 104-121, § 105(a)(1)(C), 110 Stat. 852, amended the definition of "disability" under Title II of the Social Security Act to bar benefits for any individual whose disability is based on alcoholism or drug addiction. 42 U.S.C. 423(d)(2)(C). Title II now states: "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." Id. At different times, Plaintiff has also inconsistently indicated that she was or was not a smoker. (AR 274, 361 indicating she was former smoker, AR 314, 344 indicating she had never smoked).

Listing 2.03(C) due to "markedly decreased visual fields and visual efficiency of less than 20%." (AR 299).[3]

Plaintiff and her family moved to South Carolina in August of 2010. (AR 43). When Plaintiff's disability case came up for review, more recent eye test results indicated she had normal visual acuity and visual field in her better eye. For example, in 2010, Plaintiff had several vision tests. (AR 152-153, 213-217, with the testing on January 15, 2010 showing OD 20/125 and OS 20/40, with the 20/125 vision corrected to 20/50 with glasses, and noting that Plaintiff was taking "Oxyycodone").[4] She had another vision test on December 22, 2010 at University Specialty Clinics Dept. of Opthamology, which showed OD 20/100 and OS 20/40 (corrected to 20/20 with glasses). (AR 153, 225). Dr. Charles Walvoord also tested Plaintiff's vision on May 25, 2011. Based on the test results, the Commissioner found on June 23, 2011 that Plaintiff's condition had medically improved and no longer met the criteria for Listing 2.03C. The Commissioner determined that Plaintiff was not entitled to continuation of disability benefits. This decision was upheld on reconsideration.

Meanwhile, in February of 2011, Plaintiff obtained a neurological exam by Dr. J.E. Carnes of SC Neurological Clinic. (AR 195, 366-68). Based on Plaintiff's self-reported complaints of pain, her medical history (including "optic neuritis), and her insistence that she feared she might have muscular dystrophy ("MS"), Dr. Carnes ordered an MRI/CT brain scan. (AR 164, 366-68). The MRI results were normal. (AR 229 "patient has normal reflexes, normal sensory exam, no ataxia, and no weakness … she has excellent strength in her legs including

---

[3] The listings for visual disorders were revised, effective February 20, 2007. See Revised Medical Criteria for Evaluating Visual Disorders, 71 Fed.Reg. 67037 (Nov. 20, 2006). The revised Listing was in effect at the time of the Commissioner's decision in this case.

[4] Oxycodone (generic name), also known as "OxyContin" (brand name), is a narcotic pain medication. See www.drugs.com/oxycodone. The most frequent minor side effects of such medication include gastrointestinal symptoms, stomach pain, dizziness, and headache. See www.rxlist.com/oxycontin-side-effects.

standing repeatedly from a low stepping stool … her neurologic exam … is unremarkable … I have made it clear that her examination has remained normal now for almost six years … she shows no specific nerve dysfunction;" AR 366 indicating MRI and workup was "completely unremarkable"). Dr. Carnes refused to prescribe narcotic medication for Plaintiff. (AR 230).

In July of 2011, after the decision to discontinue Plaintiff's DIB benefits, Plaintiff began seeing family practitioner Dr. Tasha Boone, M.D. Plaintiff indicates that Dr. Boone prescribed various medications, including Lyrica and hydrocodone, for her generalized complaints of pain. (AR 43, 184, diagnosing fibromyalgia). Plaintiff also started seeing SC Pain Associates (Dr. Tony Owens, M.D.), The Pain Center (Dr. Gisele Girault, M.D), and Dr. Thomas Armsey, M.D., for pain management, and over the course of 2011-2012, obtained prescriptions for various medications, including Norco, Vicodin, Tramadol, Lortab, Cymbalta, Antivert, and Topomax. (AR 52, 184, 190-191, 195, 289, 341, 347, 364).[5] In these visits, Plaintiff complained largely of low back pain (AR 346, 351-364, noting that patient reported dull back pain, but was negative for difficulty in concentration, anxiety, or depression). Plaintiff reported occasional headaches associated with her back pain (AR 359, 362). Dr. Owens indicated that the "patient's symptoms are relieved by medication." (AR 361, 10/25/2012).

Dr. Boone's treatment notes indicate that as of 08/09/2011, she had "reviewed and reconciled" the medication list with Plaintiff, and that the current medications were Lyrica and Nexium.[6] Dr. Boone indicated she was going to prescribe Cymbalta instead of Lyrica for

---

[5] Hydrocodone is the generic name, while Lortab, Norco, and Vicodin are brand names for the hydrocodone-acetaminophen combination. Tramadol is a pain medication in the same "opioid analgesic" drug class as Oxycodone. See www.drugs.com/oxycodone.

[6] Lyrica is used to treat fibromyalgia and nerve pain. Common side-effects of Lyrica may include headaches, dizziness, blurred vision, bloating, and pain. Less common side-effects may include anxiety, decrease in vision, eye disorders, and loss of energy. See www.drugs.com/sfx/lyrica-side-effects and www.lyrica.com/answers (indicating that these common side-effects "were generally mild to moderate").

fibromyalgia. (AR 51, 262). Plaintiff testified that Dr. Owens also told her she didn't need to take Lyrica or Lexapro. (AR 53).[7] Treatment notes indicate that Plaintiff "responded well" to Cymbalta. (AR 275, 342). In 2011, Plaintiff also started going for monthly visits to a psychiatrist, who prescribed anti-depressants (i.e., Effexor, Klonopin). Treatment notes indicate Plaintiff also "responded well" to this medication. Dr. Boone continued Plaintiff's medications in 2012 "due to positive benefit." (AR 353).

Upon Plaintiff's request, Administrative Law Judge ("ALJ") Walter C. Herin, Jr., held a hearing on December 7, 2012. (AR 31). Plaintiff (represented by counsel) and a vocational expert ("VE") both appeared and testified. The ALJ further developed the record by ordering physical and mental assessments. Dr. Jim Liao, M.D., and psychologist Larry Clanton, PhD., submitted residual functional capacity ("RFC") assessments. (AR 242-259, 292-299). Dr. Boone also completed an RFC assessment in October 2011 after seeing Plaintiff three times. (AR 21, 302-309). On September 27, 2011, Dr. Liao indicated that Plaintiff's eye problems did not meet any Listing. On June 22, 2011, psychologist Clanton indicated that Plaintiff had some mild to moderate limitations, but could still perform simple repetitive work tasks. Dr. Boone's assessment was more restrictive, but the ALJ found that this was not supported by the treatment notes and other evidence of record.

Plaintiff acknowledged that despite her alleged problems, she had no difficulty getting along with people, completing tasks, using her arms, and understanding or following directions. (AR 158). Her self-reported daily activities included taking care of her three children, driving her car, shopping at Wal-mart, shopping for groceries, attending church, watching movies, playing

---

[7] Lexapro is used to treat depression and anxiety. Common side-effects may include drowsiness, insomnia, vision changes, and nausea. See www.webmd.com/drugs.

with her children, preparing light meals, doing laundry, surfing the Internet, helping to clean the sink/tub/toilet, and paying bills (AR 39-41, 53-54, 157, 254). Plaintiff is able to bathe, dress, and takes care of her own hygiene (AR 40). She indicates her hobbies include researching, decorating, reading, watching movies, and spending time with her family. (AR 157). Plaintiff indicated she had a driver's license.[8]

At the hearing, Plaintiff testified that her doctor had prescribed eye glasses and indicated that she should wear them every day to protect her better eye (AR 339), but that she does not always wear them. (AR 54-55 "every other day"). The ALJ observed that Plaintiff was not wearing her eye glasses at the hearing. (Id.). As for pain medication, Plaintiff testified that she takes it "when needed." (AR 46-47) and that it relieved her pain. (AR 48-49, Q: Are you still in pain when you're on your medication? A: No.). She indicates that she stopped taking certain medication (such as Lyrica) because it made her drowsy (AR 51, 262). Although Plaintiff feared that she had MS (muscular dystrophy), diagnostic testing ruled this out. (AR 159).

At the hearing, the ALJ asked hypothetical questions which incorporated Plaintiff's abilities and functional limitations. (AR 57-63, ALJ observing that "the vision in the unaffected eye is now measured at 20/40, at least with correction and [she] is legal to drive an automobile"). The VE testified that Plaintiff could perform various jobs at the sedentary unskilled level within her restrictions, such as order clerk (1,960 jobs in S. Carolina), ink printer (2,726 jobs in S. Carolina), and patcher (582 jobs in S. Carolina). (AR 65).

On January 28, 2013, after reviewing all the evidence, the ALJ issued a detailed decision denying the continuation of disability benefits. (AR 12-25). In summary, the ALJ found that: 1)

---

[8] The South Carolina Department of Motor Vehicles' minimum visual acuity requirements, with or without corrective lenses, are: "20/70 or better in at least one eye; OR If applicant's weaker eye is worse than 20/200, the stronger eye must read 20/40 or better." It further provides that if the applicant's eyesight is "[w]orse than 20/70 in each eye but 20/70 or better with both eyes together … this reading is only acceptable if accompanied by a statement from the eye care professional that no further improvement in vision can be made." See www.scdmvonline.com.

at the time of comparison point decision ("CPD") on September 24, 2007, 2) claimant had a visual disorder that met Listing 2.03C; 3) she had not engaged in any substantial gainful activity through June 2011; 4) as of June 2011, she had "severe" impairments due to history of optic neuritis, recurrent headaches, degenerative disc disease, rule out fibromyalgia, anxiety with panic attacks, and depression;[9] 5) her impairments did not meet or medically equal the criteria of any Listing; 6) she had medically improved as of June 2011; 7) such medical improvement was related to her ability to work; 8-9) she had various restrictions and could not perform her past relevant work, but retained the RFC to perform less than a full range of sedentary work; 10) she was a "younger" individual as of June 2011; 11) she communicates in English and has a high school education; 12) transferability of skills is not an issue; 13) as of June 2011, she could still perform a significant number of jobs existing in the national economy, and 14) her disability ended as of June 2011. (AR 12-25).

On May 6, 2014, the Appeals Council declined review, and the ALJ's decision is the Commissioner's final decision. Plaintiff sought judicial review on June 27, 2014. Briefing is now complete (DE# 13, 15, 16), and this matter is ripe for review.

## III. Standard of Review

The SSA limits this Court's review of the Commissioner's final decision to: (1) whether substantial evidence supports such decision; and (2) whether the Commissioner applied the correct legal standards. 42 U.S.C. §§ 405(g), 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Smith v. Heckler*, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting *Perales*, 402 U.S.

---

[9] Plaintiff indicated that as of September 19, 2011, she had fibromyalgia, depression, and anxiety (AR 182 indicating "new conditions" since last disability report).

at 401); *Hunter*, 993 F.2d at 34 (same). Substantial evidence is defined as "more than a mere scintilla but less than a preponderance." *Smith v. Chater*, 99 F.3d 635, 637–38 (4th Cir. 1996).

The Fourth Circuit has emphasized that it is not for the reviewing court to re-weigh the evidence, make credibility determinations, or substitute its judgment for that of the Commissioner, so long as that decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456; *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). It is the duty of the Commissioner, not the courts, to make findings of fact and resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456; *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979) ("this court does not find facts or try the case *de novo* when reviewing disability determinations"); *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976) (same). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the court would decide the case differently. *Lester v. Schweiker*, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. Analysis

### A. Whether the ALJ failed to account for "missed work" due to migraine headaches

Plaintiff complains that the ALJ's RFC (which limited Plaintiff to unskilled, low stress work at the sedentary level) did not "sufficiently accommodate" her impairment of migraine headaches. (DE# 13 at 7).[10] Plaintiff contends that "the frequency and duration" of her migraine headaches would result in "at least three unscheduled absences per month," thereby rendering her unable to work.

The Commissioner responds that the evidence of record does not substantiate the Plaintiff's allegation that she would have migraines 3-4 times per month. (DE# 15 at 15, "In fact,

---

[10] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Low stress work is "work that does not have a rigid and inflexible production schedule, does not require adaptation to frequent changes at the workstation, and does not require complicated decisionmaking." (AR 17). The ALJ imposed various postural restrictions, as well as a restriction against tasks "requiring binocular vision or keen depth perception." (AR 16-17, Finding 8).

no objective evidence in the current record (including Dr. Boone's RFC assessment) supports such a limitation."). As to the frequency of alleged headaches, the Commissioner aptly points out that in seven routine office visits to family physician Dr. Boone between July 2011 to October 2012, Plaintiff mentioned migraines only twice (and mentioned headaches two other times). In fact, the treatment notes from those visits indicate that Plaintiff was seeing the doctor for other reasons. As the ALJ correctly observed, Plaintiff was never hospitalized for migraines and never required or sought any emergency care (i.e., treatment to help stop a migraine in progress). The ALJ observed that Plaintiff had received no such specialized treatment for migraine headaches. The Commissioner points out that Plaintiff did not even identify migraines as a disabling condition at the hearing. The Commissioner points out that Plaintiff's brain MRI and neurological examination in 2011 by Dr. Carnes were "completely unremarkable" and reflected "normal" findings.

Plaintiff urges that these normal MRI results are allegedly "of little consequence" and suggests in conclusory fashion that the occasional migraines were "the product of a myriad of medical issues, including anxiety, depression, fatigue, fibromyalgia, and optic neuritis" (DE# 13 at 8). Plaintiff argues that in February 2012 Dr. Owens prescribed "Topomax" for migraine prevention and that this amounts to "specialized treatment." (AR 314). As the Commissioner correctly points out, Plaintiff had not required any hospitalization or treatment to stop a migraine in progress. Plaintiff does not allege that the Topomax was ineffective in preventing migraines. Although Plaintiff characterizes this preventative medication as "specialized treatment," the Commissioner correctly asserts that "a symptom that can be reasonably controlled by medication or treatment is not disabling." (AR 15 at 14). The Fourth Circuit Court of Appeals has held that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling."

Gross v. Heckler, 785 F.2d 163, 1166 (4th Cir. 1986); see also, e.g., McCullough v. Colvin, 2013 WL 2285919, *5 (D.S.C. 2013) (the ALJ "properly considered Plaintiff's improvement while on medication"). After beginning Topomax in February 2012, Plaintiff had a subsequent visit with Dr. Boone in April 2012 and indicated that "overall she was doing OK" and did not even mention any headaches. (AR 339). In a follow-up visit with Dr. Owen, Plaintiff's "current problems" are listed as low back pain and fibromyalgia, but headaches are not listed as a current problem. (AR 344-345). Subsequent notes also do not mention headaches.

Plaintiff contends that her other "pain" medication supports her allegation about the frequency of her absences from work due to headaches. The medical records, however, reflect that Plaintiff's main complaint to her pain management doctors was low back pain, and that she seldom even mentioned headaches, much less migraine headaches. The primary diagnosis of her family physician (Dr. Boone) was fibromyalgia, based on triggerpoint tenderness. (AR 316). In any event, Plaintiff herself testified that her medication relieved her pain. (AR 48-49, Q: Are you still in pain when you're on your medication? A: No.).

Although Plaintiff's counsel asked the VE to assume the claimant would have to miss three or more days of work per month due to pain and other symptoms (AR 65-66), such assumption is not substantiated by the evidence of record as a whole, and the ALJ properly did not incorporate it into the RFC. The ALJ's hypothetical question accurately represented Plaintiff's limitations that were supported by the evidence as a whole.

Plaintiff's argument appears to be based on a misreading of the hearing transcript. At the hearing, Plaintiff indicated that in 2007, while pregnant with her third child, she had unspecified "pain" and was calling in sick. In this testimony, she did not refer to headaches. In response to a question by counsel (AR 48, "at least three times a month you would call in sick?"), Plaintiff

indicated "Oh, yeah. Oh, yes, I think so." This testimony did not mention headaches and pertains to 2007. This is not evidence that Plaintiff's alleged headaches would cause excessive absences in 2011-2012. Plaintiff was not prescribed Topomax for headache prevention until February 2012. The medical records do not reflect that Plaintiff had migraines of the alleged frequency and duration, particularly after beginning Topomax in 2012. See, e.g., Foskey v. Colvin, 2014 WL 1903340, *10 (E.D.Va. 2014.) (affirming Commissioner's decision because "[t]he objective medical records showed that the migraines were treated through medication, that no other abnormalities existed as a result of physical and neurological testing, and that compliance with medication regimens alleviated symptoms."). The ALJ's decision is supported by substantial evidence.

**B. Whether the ALJ's credibility evaluation of Plaintiff's subjective allegations of pain and functional limitations is supported by substantial evidence**

Next, Plaintiff challenges the ALJ's finding that Plaintiff was "less than fully credible" with respect to her complaints of pain and resulting functional limitations. When assessing the credibility of a claimant's allegations, the ALJ first determines whether objective medical evidence demonstrates the existence of medically determinable impairments that could reasonably cause the alleged pain. 20 C.F.R. §§ 404.1529 and 416.929; *Craig v. Chater*, 76 F.3d 585, 596 (4th Cir. 1996). The ALJ then considers evidence of the intensity, persistence, and functionally limiting effects of the claimant's alleged pain. *Id.*; SSR 96-7p. When assessing a claimant's credibility, an ALJ considers the entire record, including: (1) the claimant's testimony and other statements concerning pain or other subjective complaints; (2) the claimant's medical history; (3) any laboratory findings; (4) objective medical evidence of pain, if any; (5) the claimant's activities of daily living; and (6) any course of treatment the claimant has undergone

to alleviate pain. *Craig*, 76 F.3d at 595. The ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p.

The ALJ found that Plaintiff had various impairments and had experienced some "recurring headaches" (AR 23) and that such problems "could reasonably be expected to produce the alleged symptoms," but that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible. (AR 17-23). See, e.g., *Hutchinson v. Astrue*, 2012 WL 1267887, *8 (M.D.N.C.) ("the issue … is not whether Plaintiff's pain exists; it undoubtedly does and the ALJ so acknowledged…[the issue is whether the ALJ considered the record as a whole and properly determined] that the extent and limiting effects of that pain were not as great as Plaintiff claimed.").

In challenging the ALJ's credibility finding, Plaintiff repeats her assertion that she was taking Topomax for "migraine prevention." While seeking to explain away the fact that she never sought or needed any emergency care for migraines, Plaintiff suggests that her additional medications Vicodin and Tramadol "would effectively treat the pain from migraines, albeit over the course of several hours." (DE#13 at 9). Plaintiff then urges, without relevant explanation, that this would "preclude receipt of narcotic pain medication from other sources, including the emergency room." Contrary to Plaintiff's rather illogical argument, the assertion that her pain medication effectively treated any headaches, thereby eliminating any need for emergency care, does not provide a basis to find that the ALJ's credibility evaluation was not supported by substantial evidence.

Plaintiff argues that the ALJ misinterpreted the treating notes to mean that Plaintiff's migraines were improving (AR 21) when in fact Plaintiff had reported (rather inconsistently) to

Dr. Boone on December 6, 2011 that "her headaches appear to be getting worse but overall she is feeling better and has no other issues to discuss at this time" (AR 337).

Plaintiff ignores the fact that the ALJ's discussion actually pertained to his weighing of Dr. Boone's RFC, not Plaintiff's credibility. (AR 21). Moreover, Plaintiff also ignores subsequent treatment notes from follow-up visits, which the ALJ considered and cited in his lengthy and very thorough decision. (AR 21, referring to April 2012 treatment notes that indicated claimant reported "doing OK overall"). Notably, Dr. Boone's notes on April 19, 2012 indicate that Plaintiff "reports that overall she is doing OK and has no other issues to discuss at this time" and do not reflect that Plaintiff was still having any headaches. (AR 339-340, setting a follow-up visit in four months). Under SSA regulations, an "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." SSR No. 96–7p, 1996 WL 374186, at *7 (S.S.A.1996).

Similarly, in his April 23, 2012 notes, Dr. Thomas Armsey, M.D., discusses Plaintiff's reported back pain and fibromyalgia, but makes no mention of any complaints of headaches. (AR 341-342 "She has responded well to Cymbalta and pain meds without side effects. She does feel that she is more functional and has less pain while on her medication regimen."). The ALJ observed various treating physicians had repeatedly indicated that Plaintiff's conditions had improved with medication. (AR 16). For example, pain specialist Dr. Owens indicated that the "patient's symptoms are relieved by medication." (AR 361, 10/25/2012). See Gross, 785 F.2d at 1166 ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). Plaintiff testified that her pain medication was effective. (AR 48-49, Q: Are you still in pain when you're on your medication? A: No.).

Although the Plaintiff does not challenge any other aspect of the ALJ's credibility determination, the undersigned observes that the ALJ appropriately considered other relevant factors, such as Plaintiff's "reported significant activities of daily living." (AR 16, 23). See *Gross*, 785 F.2d at 1166 (claimant's daily activities supported ALJ's finding that the claimant's alleged impairments were not as severe as claimed). The ALJ observed that Plaintiff's activities of daily living did not suggest limitations to the extent claimed by Plaintiff. (AR 23). The ALJ also discussed the findings of Monica Wright, Psy.D, who examined Plaintiff on May 20, 2011. (AR 23). Ms. Wright observed that although Plaintiff claimed limitations from pain, Plaintiff indicated she was able to take care of her three young children. (AR 233-234).

The ALJ properly relied upon the record as a whole when assessing the credibility of Plaintiff's subjective complaints. "It is the province of the [ALJ], and not the courts, to make credibility determinations." *Mickles*, 29 F.3d at 929.  The ALJ was able to observe the demeanor and to determine the credibility of the claimant, and "the ALJ's observations concerning these questions are given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). The ALJ appropriately considered Plaintiff's subjective claims and adequately explained his credibility findings. See *Craig*, 76 F.3d at 591–96.  His credibility determination is supported by substantial evidence.

**C. Whether the ALJ did not give sufficient weight to the RFC opinion of Plaintiff's treating physician**

To be given controlling weight, a treating source's opinion must be well-supported by medical signs and laboratory findings and consistent with the other substantial evidence of record. 20 C.F.R. § 416.927(c)(2). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded

significantly less weight." *Craig*, 76 F.3d at 590; *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). As the Commissioner correctly points out, opinions by physicians on the ultimate issue of whether a plaintiff is "disabled" for purposes of the SSA are not given controlling weight because the decision on that issue is reserved to the Commissioner alone. 20 C.F.R. § 416.927(d).

Plaintiff argues that the ALJ "disregarded" Dr. Boone's RFC opinion based upon an erroneous reading of Dr. Boone's treatment notes. More accurately, the ALJ gave "limited weight" to Dr. Boone's RFC assessment. (AR 21, 302-309). The ALJ explained that Dr. Boone's opinion about the severity of Plaintiff's restrictions was inconsistent with her own treatment notes (AR 21). The ALJ correctly noted that at the time Dr. Boone prepared the RFC, she had only seen Plaintiff three times. The regulations recognize that the nature and extent of the treatment relationship may affect the weight afforded by an ALJ. 20 C.F.R. § 416.927(c).

Plaintiff repeats her prior argument that the ALJ misread Dr. Boone's December 6, 2011 notes where Dr. Boone indicated that Plaintiff "reports that her headaches appear to be getting worse" rather than "improving" (DE# 13 at 11, citing AR at 337). The ALJ referred to the October notes, not the December notes. (AR 21). In any event, and as already discussed, the ALJ accurately referred to Dr. Boone's subsequent notes in April 2012 which omitted any mention of headaches and indicated that Plaintiff "reports that overall she is doing OK and has no other issues to discuss at this time." (AR 339-340, notes April 19, 2012). The Commissioner aptly points out that although Plaintiff relies on Dr. Boone's RFC assessment solely to advance her contention that she experienced disabling migraines (DE# 15 at 19, citing DE# 13 at 10-11), Dr. Boone did not even mention migraines anywhere in her RFC assessment. To the extent Dr. Boone opined that Plaintiff was "disabled," the ALJ correctly indicated that such conclusion is

reserved to the Commissioner. (AR 21, citing SSR 96-5p). The ALJ's decision is supported by substantial weight.

## **RECOMMENDATION**

Accordingly, the Magistrate Judge **RECOMMENDS** that the Commissioner's final decision be **AFFIRMED**.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE